HOWARD M. WITBECK, a Taxpayer of the City of Lockport, N. Y., in Behalf of Himself and All Other Taxpayers of Said City, Similarly Situated, Who May Come into This Action as Parties Plaintiff, and Others, Respondents, *v.* THE NIAGARA, LOCKPORT AND ONTARIO POWER COMPANY and Others, Appellants, Impleaded with CITY OF LOCKPORT and Others, Defendants.

Fourth Department, November 9, 1926.

Gas and electricity — action to restrain Niagara Company and International Company from abrogating contracts and entering into new contract — said contract was made in 1906 with provision for mutual termination — contention by plaintiffs that residents of Lockport have beneficial interest in contract and that defendants stand in fiduciary relation — no trust relationship was created by facts and circumstances attending organization of Niagara Company and subsequent developments — certain of plaintiffs had no special interest in contract.

This action was brought by residents of the city of Lockport to restrain the Niagara, Lockport and Ontario Power Company and the International Power and Transmission Company from abrogating a contract entered into in 1906

between said companies in relation to the sale of electric horse power, which contract contained a provision authorizing termination by mutual consent. The action is brought on the theory that the residents of the city of Lockport are beneficiaries of an alleged trust in favor of them of which the Niagara Company is the trustee.

The plaintiffs cannot recover and are not entitled to restrain the abrogation of the contract. If the original incorporators can be treated as fiduciaries and all the residents of the city of Lockport as beneficiaries, the fiduciaries were vested with a discretion unlimited except by the requirement of good faith, and when they provided in the contract that it should continue until terminated by mutual consent, they thereby reserved a right in substance to meet changing conditions by any modification dictated by good judgment, and in the absence of evidence of bad faith they have the right within their discretion to abrogate that contract.

Furthermore, that theory cannot stand, for it seems that from the beginning there were others than the original incorporators interested in the International Company, and that that company has from 1910, if not from the beginning of its existence, been operated as a privately owned public service corporation and during all that period none of the alleged beneficiaries have raised any objection or manifested any interest in the matter, and the rates at which the power has been sold were not fixed by the contract but by what the traffic would bear, and the establishment of a rate cheap or otherwise was no part of the undertaking of the original incorporators.

Certain of the plaintiffs claim to have a special interest in the contract since they had a contract with the International Company for power, but they can claim no interest in this action by reason thereof, since the International Company is bound to perform its contract with them, and it is immaterial what the source of its supply may be.

As to other individual plaintiffs claiming a special interest in the contract, it appears that they have no contracts with the International Company but buy their power from another company which controls the International, and, therefore, their interest is too remote.

APPEAL by the defendants, The Niagara, Lockport and Ontario Power Company and others, from a judgment of the Supreme Court in favor of the plaintiffs, entered in the office of the clerk of the county of Niagara on the 25th day of November, 1925, upon the decision of the court rendered after a trial at the Niagara Equity Term.

*Locke, Babcock, Hollister & Brown* [*Louis L. Babcock* and *Warren Tubbs* of counsel], for the appellant Niagara, Lockport and Ontario Power Company.

*Storrs & Storrs* [*William W. Storrs* of counsel], for the appellants International Power and Transmission Company and others.

*Hopkins & Brim* [*Frank Irvine, David Tice, George C. Lewis, Charles L. Nicholls* and *George W. Riley* of counsel], for the respondents.

CROUCH, J.    Under date of April 7, 1906, the Niagara, Lockport and Ontario Power Company, hereinafter referred to as the Niagara

Company, made an agreement in writing, hereinafter referred to as Schedule B, with the International Power and Transmission Company, hereinafter referred to as the International Company. The Niagara Company was to sell and deliver to the International Company 20,000 electrical horsepower at sixteen dollars per electrical horsepower per annum. The agreement was to continue until terminated by mutual consent of the parties thereto. The parties now desire to abrogate that agreement and to make another upon different terms. The plaintiffs, claiming that all persons in the city of Lockport using or desiring to use electrical power have, by reason of certain facts and circumstances, a beneficial interest in the continued performance of that contract by both parties thereto, equivalent or analogous to the interest of a beneficiary under a trust, seek to restrain the proposed abrogation and to compel the continued performance of that contract. The relief sought has been granted by the court below. With that decision we disagree.

Schedule B was no doubt the outcome of efforts, continued over many years, to make Lockport a power center and to secure for the community whatever incidental benefits might accrue. The original conception was not realized. Schedule B is something quite different. Without attempting to determine whether or not any enforcible interests vested in the community when Schedule B was executed, we think there was no such interest under the facts here as to warrant the judgment granted below.

The evidential background from which the rights of the parties are to be determined is too extensive to be dealt with in detail. A broad outline, however, may be given.

By reason of the conformation of the country between the Niagara river, Lake Ontario and the city of Lockport, it seemed possible by means of a canal to establish a power plant at or near Lockport capable of producing 200,000 electrical horsepower. With that possibility in mind, a few prominent citizens in Lockport undertook to raise a fund by subscription to pay for a preliminary survey. Out of that movement in 1891 came the Lockport Business Men's Association, a voluntary organization of the usual type, having for its object the advancement of the general business interests of the city. The possibility of making Lockport the center of a large power development began at once to receive the attention of the association. It soon became apparent that the canal project could not be financed locally, and that it would be necessary to interest outside capital. Desultory efforts, characteristic of such organizations, were made to have a more or less complete survey of the canal route made, to secure options, and to get control of a charter; all,

presumably, to be used as inducement to foreign capitalists to take hold of the project and to put it through. In 1894 a charter, which had been prepared by a committee of the association, was granted by the Legislature, designating nine members of the association by name, and such other persons as they might associate with them, to constitute a body corporate under the name of the Niagara, Lockport and Ontario Power Company. It may be assumed that these nine members had been selected by the association, though that is not entirely clear on the evidence. Pursuant to the terms of the charter the nine men mentioned therein filed incorporation papers and organized the corporation with themselves as directors. The capital was fixed at $1,000, consisting of ten shares. Each of the directors subscribed and paid for one share, and the tenth share was issued to another member of the Business Men's Association. A part of the small expense of procuring the charter was probably borne by the association. Having thus, after the manner of such organizations, placed the enterprise in the hands of nine good men, the association as a body had little more to do with it. Some of the members of the association seem to have contributed small amounts to aid in securing options on lands for the power canal and generating plant. In 1896, or 1897, at latest, the Business Men's Association ceased to exist. The nine men, who for convenience may be referred to as the incorporators, secured options on land for a right of way, which were renewed from time to time, but all eventually expired. They also continued their efforts to find a responsible party to take over the charter and carry the work to completion. These efforts eventuated in 1903 in certain contracts in the nature of options, whereby it was agreed upon certain conditions to turn over to one Luther the charter and assets of the Niagara Company in exchange for a contract by him with proper covenants for the construction of the canal and plant. Luther's interest in these contracts in due time passed to a construction company, which in 1904 entered into a construction agreement with the Niagara Company. The financing was carried out by largely increasing the authorized issue of stock and by the execution of a mortgage securing a large issue of bonds. Some construction work, at least as much as was required to save the charter, was done. Then a contract was made with a Canadian power company by the terms of which 180,000 horsepower became available to the Niagara Company at a low rate. Shortly thereafter, provision was made by contract for the construction of a transmission line and transformer station near Lockport to take part of the Canadian power. Then, by four separate instruments, all under date of April 7, 1906, the original construction agreement was modified

by indefinitely postponing the building of the canal and power house at Lockport and substituting therefor a widespread system of transmission lines, constructed and to be constructed, by which the Canadian power was to be distributed. The Niagara Company released the construction company from the obligations of the old contract, all securities for the performance thereof being returned. The surviving incorporators and the personal representatives of deceased incorporators individually transferred all their interest in the stock of the Niagara Company, released all contractual obligations due to them and designated the International Company as the party with which the Niagara Company should contract for the sale and delivery of power in the city and town of Lockport; and the Niagara Company, in accordance with such designation, entered into the agreement referred to above as Schedule B, with the International Power and Transmission Company. At the time Schedule B was executed, the International Company was a paper organization merely. It was selected as a convenient instrument for the purposes of the transaction. Its existing stockholders at once withdrew and the original incorporators of the Niagara Company or some of them assumed control and by purchase of the stock, furnished the entire working capital. Thereafter and down to 1910 it carried on business as any such corporation would have done. It obtained a franchise to operate in the town of Lockport. It constructed a transmission line from the transformer station of the Niagara Company to Lockport. It erected a lightning arrester. It sold and distributed its power under contract and otherwise so far as it could find buyers. It was and still is unable to operate in the city of Lockport, because the city has refused to grant it a franchise. In 1910 the then stockholders, including all of the original incorporators of the Niagara Company who had taken stock, sold out to representatives of the Lockport Light, Heat and Power Company, a corporation which for many years had been and still is operating in the city of Lockport. Since 1910 it has been operated in connection with and under the control of the latter company. Certain disagreements having arisen in recent years between the Niagara Company and the International Company, the parties to Schedule B, litigation ensued, involving all the corporations which are parties to this action, including the city of Lockport. The effect of that situation was to entail loss and inconvenience on all concerned. By way of settling the difficulties, it was, as stated above, agreed by the immediate parties that a new contract should be substituted for Schedule B. The new contract is to run for fifteen years, the rate is increased, and there are many matters of technical detail provided for.

1. The fundamental question is whether the plaintiffs, as actual or potential users of power, have any legal or equitable right to the continued existence and performance of Schedule B.

The question was discussed below in terms of the law of trusts. So also here in the briefs of counsel. Obviously there was no express trust. The judge at Special Term said there was a constructive trust. His discussion, however, deals with the intent of the incorporators and that intent seems to be an inference from the conduct of the parties and from the surrounding circumstances. The time when the trust was created is fixed as of the date of Schedule B. He says the incorporators were the creators and the two corporations, parties to Schedule B, were charged with a trust obligation to the inhabitants of the town and the city of Lockport. That would seem to be a trust implied in fact. The learned counsel for the respondents seems so to regard it, but he carries its creation back to the granting of the Niagara Company charter which named the incorporators. He says, however, and we agree, that the question is not one of classification, but whether there is a trust which a court of equity will enforce. We may begin at the moment when the nine men acting under the charter had incorporated and organized the Niagara Company. The objective of the Business Men's Association, of which they were all members, was, as stated above, to make Lockport a great power center by means of a canal and a generating plant located there. Presumably the power at its source would be cheap and adequate. That would tend to attract industrial business to Lockport. A varied industrial development would in turn inure to the benefit of the business men of Lockport. The charter was an instrument in aid of the objective. The association could not take, hold or use the valuable rights therein granted. It selected nine men, in whose honor, energy and ability it had confidence, to take, hold and use them in any way that would conduce to the desired end. It is difficult to define the resulting relationship. Something in the nature of property came into the possession and control of the incorporators. There are various analogies, but none, so far as we can see, that does not leave a gap. They were not bailees. They were not agents. They were not trustees. The property, the rights under the charter, came from the State. Neither in terms nor in intent did the State grant them the property for the benefit of anybody else, except in the sense that in any grant to a public service corporation, indirect benefits may flow to the public. We assume the property came to them through the influence of the association. There was a tacit understanding but no contract that it was to be used for a certain end. If A prevails upon B to give C a sum of

money absolutely, it being tacitly understood between A and C that C shall use it for a particular purpose which it is thought will benefit X, Y and Z, C's obligation is moral, not legal. The Special Term met the difficulty by saying that the incorporators became "fiduciaries." Whether equity would have intervened at the suit of the beneficiaries, had the incorporators then broken faith, need not be determined. It is necessarily conceded that in making the contract Schedule B they were acting in good faith. The plaintiffs are asserting beneficial rights under it.

With the lapse of time and changing circumstances the original plan was displaced. It is asserted that Federal legislation and treaties which prevented the diversion of water from the Niagara river were responsible for that. But the origin of the change goes further back. Under the operation of the construction contracts, there was a heavy issue of stock in June, 1904. Four of the original incorporators were replaced by three representatives of the new interests. Immediately followed the acquisition of the Canadian power. It seems likely, though the evidence does not clearly show it, that the new interests were now practically in control. They had dealt, as they had the right to do, with the Niagara Company at arm's length and on the assumption that the owners of all the stock who were also the directors had full authority to act. The obligations of the construction company under the then existing contracts and the few shares of stock still held by the remaining incorporators represented the result of the incorporators' efforts to accomplish what they had set out to do.

By the spring of 1906, substantially that situation became apparent to them, as testified by the witness Higgs, who was one of the incorporators and at that time an officer of the Niagara Company. Schedule B was thereupon made.

If we understand the theory of the court below, it is that the incorporators by becoming parties to Schedule B under the corporate cloak of the International Company, merely changed the form of the property held by them and still continued "fiduciaries" bound by a moral obligation to the community; that their successors are similarly bound and that the proposed substitution of contracts would be such a breach as to warrant equity in impressing a trust on the property in their hands, although no trust was created or intended by the acts of the parties themselves. And this, we take it, is what the court meant when it referred to a constructive trust. We think that is the only arguable theory. But there are at least two objections to accepting it. If we adopt the term used below and speak of the incorporators as fiduciaries, they were, and their successors are, fiduciaries vested with a discretion unlimited except

by the requirement of good faith. When they provided that the contract Schedule B should continue until terminated by mutual consent, they thereby reserved a right in substance to meet changing conditions by any modification dictated by their best judgment. Unless the evidence is sufficient to show bad faith in making the proposed substitution of contracts, they have the right within their discretion to make it. We think the evidence is not sufficient to show bad faith.

In dealing with the question on the basis of this theory, however, one is disregarding actualities. While the evidence is not entirely clear on the point, there seem to have been from the beginning parties other than the incorporators interested in the International Company. From 1910, if not from the beginning, it has been operated as a privately owned public service corporation. None of the alleged beneficiaries has raised any objection or manifested any interest in the matter. The rates at which it sold its power were fixed, not by Schedule B, but by what the traffic would bear. The establishment of a rate, cheap or otherwise, was no part of the task undertaken by the incorporators in 1894. Their mission was to secure a large supply of power in Lockport. The rate was left to take care of itself. It seems, under all the circumstances, rather late to hark back and invoke matters long disregarded as a basis for equitable interference in what is essentially a rate dispute.

2. Certain of the plaintiffs, in addition to their several interests as members of the community, claim to have such special interest in the continued existence and performance of Schedule B as entitles them to the relief asked for.

The Globe Milling Company, predecessor of the plaintiff Federal Mill and Elevator Company, Inc., in 1907 entered into a written contract with the International Company for power. Schedule B was attached to that contract for certain purposes. The period during which the contract was to run was not fixed. In a supplementary contract there is a statement that this agreement should be perpetual, the rights of the International Company under Schedule B being perpetual.

The Simonds Manufacturing Company, predecessor of plaintiff Simonds Saw and Steel Company, in 1910 entered into a written contract with the International Company for power. The contract was to run for fifty years.

It is alleged that these companies established their plants at Lockport in reliance upon the continued existence and performance of Schedule B. It has been found below that the International Company by those contracts is estopped from consenting to the abrogation of Schedule B. The argument in substance is that

the International Company is threatening to do something which will prevent it from carrying out its power contracts with plaintiffs, to their irreparable injury. The primary obligation of the International Company to these plaintiffs is to furnish power as required by its contracts. So long as it does that, the source of its supply is immaterial. There has been no breach, and none, so far as the evidence shows, is threatened. In the absence of bad faith or of what amounts to it, a court of equity will not interfere with the discretion of a concern in managing its own business.

The plaintiffs Lockport Paper Company and Niagara Paper Mills have no contracts with the International. They buy their power from another power company. Because the latter company controls the International Company and uses as part of its total supply some of the International Company's power, it is argued that these plaintiffs have a special interest sufficient to sustain the judgment below. We think that interest is too remote.

The judgment should be reversed on the law and the facts and the complaint dismissed, with costs, including costs of this appeal, to the defendants Niagara, Lockport and Ontario Power Company and International Power and Transmission Company. Certain findings disapproved and reversed or modified and new findings made.

HUBBS, P. J., CLARK, DAVIS and TAYLOR, JJ., concur.

Judgment reversed on the law and facts and complaint dismissed, with costs, including costs of this appeal, to the defendants Niagara, Lockport and Ontario Power Company and International Power and Transmission Company. Certain findings of fact modified, disapproved and reversed and new findings made.